NOTICE

Decision filed 11/20/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 230514-U

NO. 5-23-0514

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* D.D.., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 20-JA-22 |
| | ) | |
| Marvin D., | ) | Honorable |
| | ) | Rodney S. Forbes, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Where the trial court's orders finding that Marvin D. was an unfit parent and that the best interest of the minor child warranted termination of his parental rights were not contrary to the manifest weight of the evidence, we affirm the orders.

¶ 2     Marvin D. (Marvin) is the father of a boy, D.D. The Department of Children and Family Services (DCFS) removed D.D. from the home of his biological mother on January 28, 2020. Initially, DCFS placed D.D. in Marvin's care, who was not a party to the January 28, 2020, DCFS case. Thereafter, in response to a hotline call in February 2021, DCFS removed D.D. from Marvin's home when Marvin left D.D. in the unsupervised care of D.D.'s biological mother. Due to Marvin's failure to make reasonable efforts and progress towards the return of D.D. to his care, the State filed its motion to terminate his parental rights. After the trial court found that Marvin

1

was an unfit parent, the court concluded that it was in D.D.'s best interest to terminate his parental rights. He appeals from these orders.

¶ 3                                    I. BACKGROUND

¶ 4      D.D. was born on February 24, 2017. His father is Marvin, and his mother is Ashlina C. (Ashlina).[1] When D.D. was taken into protective custody, Marvin had no prior DCFS involvement. At that time, D.D. and an older male half-sibling, S.C., were in the care of Ashlina. Ashlina's ability to parent was impaired due to her criminal activity, her substance abuse, and her failure to have a good care plan for her children. In addition, Ashlina was involved in a violent relationship with a paramour, and although she had completed services addressing this relationship, she returned to the abuser. DCFS asserted that the children were at significant risk by remaining in Ashlina's care.

¶ 5      The trial court held the first hearing on January 30, 2020, holding that probable cause existed for filing the petition because Ashlina was in jail, and Marvin was not the custodial parent. The court placed D.D. in Marvin's custody.

¶ 6      At the adjudicatory hearing on March 4, 2020, the parties stipulated to the allegations of the petition. The court found that D.D. was abused and neglected and that Marvin was a non-offending parent.

¶ 7      DCFS created its first family service plan dated March 10, 2020. DCFS reported that Marvin was in active kidney failure, was on dialysis, and was seeking a position on the transplant

---

[1]Ashlina is not a party to this appeal. However, she is involved at times with this case, and will be discussed as necessary to provide the relevant background information for the issues presented in this order. The trial court terminated Ashlina's parental rights to D.D. and another male child, S.C., on June 10, 2022. By written order, this court affirmed the trial court's findings on December 16, 2022. *In re S.C.*, 2022 IL App (5th) 220498-U.

list. Marvin resided in a one-bedroom apartment in Decatur. Since 2013, he received disability/social security income due to his kidney failure. Marvin's service plan listed the following desired outcome: "Marvin will demonstrate his ongoing ability to maintain a safe and stable home environment for him and D[.D.]." The action steps created by DCFS to support this outcome were (1) maintain a stable residence and source of income and (2) keep DCFS informed of all changes in address, phone number, and household composition.

¶ 8    A DCFS clinical screener interviewed Ashlina on May 7, 2020. Ashlina stated that she and Marvin became involved in 2011 and described their relationship as not serious. She stated that Marvin had always been involved in D.D.'s life, provided financial support, and exercised consistent visitation every Saturday through Monday. In a previous DCFS case, D.D. had been placed with Marvin. In 2019, Ashlina became homeless and reached out to Marvin for assistance. D.D. had been living with Marvin since September 2019. Thereafter, Marvin would not return custody of D.D. to Ashlina because of her involvement with another man, and he believed Ashlina was abusing drugs.

¶ 9    A DCFS clinical screener also interviewed Marvin on May 7, 2020. DCFS noted that D.D. had previously been in Marvin's care from February 2017 until January 2018 during Ashlina's earlier DCFS case. Marvin admitted that he had an alcohol-based arrest in December 2011. Marvin acknowledged the nature of his relationship with Ashlina, stating that she did not want a long-term relationship with him because of their age difference in that she was substantially younger than he was. He stated that D.D. had lived with him beginning in 2019 when Ashlina became homeless, and that he had D.D. in his care until DCFS officially placed D.D. in his protective custody in January 2020. Marvin had ongoing issues with his kidney failure that included fatigue. The DCFS screener found that Marvin had no mental health concerns. The screener was concerned that

3

Marvin did not adequately advocate for his own medical issues. DCFS wanted Marvin to develop "a system of back up caregivers for D[.D.], who can provide support[ ] to the family as needed, and build a relationship with D[.D.] so that he has additional attachments in the event that [Marvin] cannot be his primary attachment."

¶ 10    DCFS filed a dispositional report with the court on June 18, 2020. D.D. was living with Marvin. Because of the COVID-19 pandemic, D.D. was attending school online instead of in person. Three times each week when Marvin had dialysis treatment, D.D. stayed with his maternal great-grandmother.

¶ 11    On June 25, 2020, the trial court entered a dispositional order making D.D. a ward of the court consistent with his health, welfare, safety, and best interest. The court also found that Marvin was "fit, able, and willing to care for, protect, train, educate, supervise[,] or discipline the minor and [that Marvin] will not endanger the health, welfare, and safety of [D.D.]." The court found that reasonable efforts and appropriate services had been made to keep D.D. in Marvin's home and that D.D.'s health, welfare, and safety were not compromised by leaving him in Marvin's care. The court adjudicated D.D. as neglected, made him a ward of the court, and placed custody with Marvin. The court did not place guardianship of D.D. with DCFS.

¶ 12    DCFS filed a permanency report with the court on October 19, 2020. DCFS noted that it had observed Marvin's home in Decatur and found it to "always be clean, tidy, organized, and free of any safety concerns or hazards." The permanency goal remained to return D.D. home within 12 months. D.D.'s half-brother, S.C. (Ashlina was the mother, but Marvin was not the father), was placed with Marvin on July 31, 2020, "in order to facilitate sibling placement between S[.C.] and his younger brother." Marvin stated that both boys were struggling with online remote school learning.

4

¶ 13    On October 21, 2020, the trial court entered its permanency order with the goal to return D.D. home within 12 months. At that time, Ashlina was not making reasonable efforts or reasonable progress. The court noted that D.D. was with a "fit parent," and "no parenting plan is in place." The trial court continued physical custody and guardianship of D.D. with Marvin.

¶ 14    DCFS filed its next family service plan dated January 4, 2021. With respect to Marvin, DCFS noted that the case remained open in order to provide him with supportive services. DCFS recommended no specific services for Marvin as of the date of this service plan. S.C. remained with D.D. and Marvin, but DCFS noted that it was still seeking a relative or other fictive kin placement for S.C. because Marvin would not be able to provide a permanent solution for S.C. DCFS rated Marvin satisfactory on his action step requirement to maintain a stable residence and finances. In addition, Marvin was rated satisfactory on meeting monthly with DCFS and keeping them advised of any changes in his contact information or household composition.

¶ 15    On February 26, 2021, after DCFS received a hotline call about D.D. and S.C., the State filed a "Supplemental Petition/Petition to Revoke Supervision" alleging that (1) D.D. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2018)) because he was in an environment injurious to his welfare; (2) D.D. was neglected pursuant to section 2-3(1)(d) of the Act (*id.* § 2-3(1)(d)) because he was in an environment that created a substantial risk of non-accidental physical injury; and (3) D.D. was abused pursuant to section 2-3(2)(ii) of the Act (*id.* § 2-3(2)(ii)) because he was at substantial risk of non-accidental physical injury. The State alleged that DCFS instructed Marvin "several" times that Ashlina was not to have unsupervised contact with D.D. and could not be placed in a caretaker role. However, Marvin admitted to DCFS that he allowed Ashlina to be D.D.'s sole caretaker

several times, most recently on February 24, 2021. The State requested that the court set a shelter care hearing for February 26, 2021.

¶ 16    On February 26, 2021, DCFS filed its shelter care report. S.C.'s school had made a DCFS hotline call to inform DCFS that Ashlina appeared to be with S.C. on February 24, 2021. Marvin later admitted that Ashlina had been in his home for one hour. At issue was S.C.'s refusal/inability to complete homework. Marvin stated that he had asked Ashlina to come over to the house to assist with getting S.C. logged back into virtual learning. In addition, Ashlina wanted to see D.D. to celebrate his birthday. Marvin acknowledged that he left the children alone with Ashlina when he went to receive his dialysis treatment. However, Marvin skipped the dialysis treatment after speaking to his sister who advised him that he could not leave the children in Ashlina's care. Marvin confirmed that he had been told that Ashlina could not stay with the children, and he admitted that he had left the children with her in the past for short periods. DCFS reported that while Marvin understood why the children were initially removed from Ashlina's care, he failed to understand that Ashlina posed an ongoing risk to her children. DCFS concluded that Marvin had put his own personal needs over the children's needs and in doing so blatantly ignored the rules established by DCFS.

¶ 17    On February 26, 2021, the trial court entered its temporary custody order finding probable cause for the petition because Marvin allowed Ashlina to watch the children while unsupervised. The court found that there was an immediate and urgent necessity to remove D.D. from Marvin's home. The court placed temporary custody of D.D. with DCFS and ordered DCFS to provide Marvin with supervised visitation.

¶ 18    On April 16, 2021, DCFS filed a permanency review report, noting that it was working to set up mental health and parenting assessments for Marvin. The permanency goal was to return

6

D.D. home to Marvin by February 2022. DCFS indicated that Marvin was willing to engage in services and work towards reunification with D.D. Although Marvin had previously demonstrated his "ability to meet minimal parenting standards and ensure his son's basic needs are met ***[,] he needs to receive services to enhance his parenting capacity and address his co-dependency issues with [Ashlina] before reunification can safely occur."

¶ 19    On April 21, 2021, the court held the next permanency hearing and entered its order finding that the appropriate permanency goal for D.D. was to return him to Martin's care within 12 months. The court found that while Marvin had made reasonable efforts, he had not made reasonable and substantial progress as of the hearing date.

¶ 20    On April 26, 2021, the trial court held a supplemental dispositional hearing and found that it was consistent with D.D.'s health, welfare, safety, and best interest to make him a ward of the court. The court also found that Marvin was unfit and unable to care for D.D. due to his setback in allowing Ashlina to care for D.D. despite prior admonishments.

¶ 21    DCFS filed its next permanency review report on September 29, 2021. DCFS reported that it had made referrals for Marvin to be assessed for parenting and mental health services but had difficulty in establishing contact with him. Marvin eventually completed both assessments. Based upon Marvin's mental health assessment, his counselor recommended weekly counseling sessions. Marvin's counselor stated that Marvin's attendance had become more consistent, but that Marvin failed to understand why he needed counseling. While Marvin understood the error he made leaving D.D. with Ashlina, his counselor stated that he did not understand why D.D. had not been returned to him and focused his energy on blaming DCFS for the trauma D.D. had endured during their separation. The counselor reported that she works with Marvin on managing his stress and planning for his needs, D.D.'s needs, and Marvin's future because of his ongoing health problems.

7

DCFS rated Marvin unsatisfactory on mental health counseling. Marvin completed his parenting assessment which showed that he was at "medium risk" in all parenting areas. Marvin's attendance in parenting services had improved. Marvin was reported to be open to parenting services and participated well in sessions. The parenting educator worked with Marvin on being more interactive with D.D. during visits. Marvin was rated satisfactory on parenting because he was progressing in the required program. Marvin's residence remained appropriate for D.D. DCFS expressed its long-term concerns with Marvin's health issues and the fact that his extended family was primarily located in the Chicago area. DCFS stated that Marvin "needs to develop a concrete plan of who his supports and care plan will be as further health complications persist, should D[.D.] be returned to his care."

¶ 22    On October 6, 2021, the trial court entered its permanency order maintaining the permanency goal to return D.D. to Marvin within 12 months, noting that he was making reasonable efforts, but not reasonable and substantial progress on his service plan objectives.

¶ 23    DCFS filed its next permanency review report on April 1, 2022. The most recent service plan was dated January 3, 2022. Marvin was then working with Homeward Bound to obtain alternative housing as there had been no running water in his apartment complex since June/July 2021, and in February 2022, he had received an eviction notice. Since October 2021, Marvin had only attended five mental health counseling sessions. His mental health progress was rated unsatisfactory. Marvin reportedly lacked understanding of the DCFS case and did not believe that there were any issues he needed to work through. Marvin was also rated unsatisfactory on parenting services in that he lacked understanding of how to properly parent and did not understand the developmental stage of his son, treating D.D. as if he was younger than he was. Marvin was

8

consistent with his supervised visitation and exhibited love and affection for D.D. He expressed his frustration about not being allowed additional time with D.D.

¶ 24    The trial court entered its permanency order on April 6, 2022, maintaining the permanency goal to return D.D. home to Marvin in 12 months, but noting that Marvin was not doing well in his services—he had not made either reasonable efforts or reasonable and substantial progress toward returning D.D. home.

¶ 25    On September 23, 2022, DCFS filed its next permanency review report, noting increasing concerns regarding Marvin's health. Marvin's consumption of alcohol had increased since D.D. was removed from his care, and he reported having been recently arrested for driving under the influence. He had not yet received housing assistance through Homeward Bound and remained on the waiting list. However, DCFS noted that the housing issues were not his fault. Marvin was rated unsatisfactory in his mental health and parenting services. Mental health services were not progressing because Marvin remained defensive and upset about DCFS's removal of D.D. from his care. He minimized the foundational issue of leaving D.D. in Ashlina's care and was described as "stuck in his ways and refusing to make any progress." In July 2022, Marvin's counselor left the agency. As of the date of the permanency review report, a new counselor had yet to be assigned to Marvin for continuing sessions "due to staff turnover and shortage[s]." DCFS reported that Marvin's counselor "initially recommended that he continue [with] mental health counseling on a bi-weekly basis, due to the lack of progress that he had made." Marvin continued to be consistent with his supervised visits although remained frustrated about not having additional time with his son. DCFS reported that Marvin showed love and affection for D.D.

¶ 26    On October 5, 2022, the trial court entered its permanency order maintaining the permanency goal of returning D.D. home to Marvin within 12 months. However, the court found

9

that Marvin had made neither reasonable efforts nor reasonable and substantial progress toward that permanency goal.

¶ 27    On March 29, 2023, DCFS filed its next permanency review report. The most recent service plan was dated January 18, 2023. Marvin had obtained new housing. DCFS reported that Marvin's previous mental health counselor had not recommended transferring Marvin's case to another counselor.[2] Overall, Marvin was rated unsatisfactory on his mental health services. Similarly, he was rated unsatisfactory on his parenting services as DCFS stated he was "unable and unwilling to listen to any information or advice given to him, and constantly wants to dispute things he is told." During this reporting period, Marvin had missed "several" supervised visits, and ended other visits early. When offered additional "makeup" visits or time, Marvin declined these opportunities, noting that that "there's nothing to do for that long." DCFS asked the trial court to change the permanency goal to substitute care pending a court determination on termination of Marvin's parental rights, stating that he "has remained resistant toward DCFS and his service providers and lacks overall understanding of his parenting role and responsibilities for his son."

¶ 28    Also on March 29, 2023, the State filed its motion seeking a finding that Marvin was an unfit parent and an order terminating his parental rights. The State alleged that Marvin was unfit for (1) failing to maintain a reasonable degree of interest, concern, or responsibility as to D.D.'s welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) failing to make reasonable efforts to correct the conditions that were the basis for the removal of D.D. from his care during any nine-month period

_____

[2]The record on appeal does not contain a report from this counselor, but we note that there is a potential discrepancy in what DCFS reported that the counselor recommended upon her departure from the agency. In the previous permanency review report dated September 23, 2022, DCFS indicated that it was attempting to assign another counselor to work with Marvin on a bi-weekly basis as recommended by his outgoing counselor. However, in this next March 29, 2023, report, DCFS indicates that the previous counselor did not recommend Marvin for continuing therapy. Regardless, no mental health counselor was assigned to work with Marvin in this intervening six months.

following the adjudication of neglect (*id.* § 1(D)(m)(i)); and (3) failing to make reasonable progress to correct the conditions that were the basis for the removal of D.D. from his care during the following nine-month periods: (a) between March 9, 2020, and December 9, 2020; (b) between December 9, 2020, and September 9, 2021; (c) between September 9, 2021, and June 9, 2022; and/or (d) between June 9, 2022, and March 9, 2023 (*id.* § 1(D)(m)(ii)).

¶ 29    On April 5, 2023, the trial court entered its permanency order changing the permanency goal to substitute care pending the court's ruling on the State's petition to terminate Marvin's parental rights. The court found that Marvin had made neither reasonable efforts nor reasonable and substantial progress on his service plan objectives.

¶ 30    On May 18, 2023, the trial court held the fitness hearing. The State called one witness, Lindsay Horcharik, who is employed by DCFS. Marvin testified on his own behalf.

¶ 31    Horcharik testified that her specific DCFS role is a placement supervisor in the Decatur DCFS office. D.D. came into DCFS care in January 2020 and was placed with his biological father, Marvin. D.D. was made a ward of the court, but guardianship was not placed with DCFS. Horcharik testified that although Marvin was not initially required to engage in services, in February 2021 that changed because he left D.D. and his brother, S.C., unsupervised with their mother, Ashlina.

¶ 32    Horcharik testified that on April 26, 2021, D.D. was placed under DCFS guardianship. At that point, Marvin was provided with a service plan and directed to complete mental health and parenting objectives. Horcharik testified that Marvin worked with two different counselors but that he was never rated satisfactory on this objective. She explained that although Marvin made some progress, he would backtrack due to his argumentative nature. Marvin's attendance was

inconsistent as well. His counselor recommended that Marvin be unsatisfactorily closed out from further mental health sessions on July 8, 2022.

¶ 33    Horcharik testified that Marvin completed the parenting program, but ultimately, he was rated unsatisfactory on this service plan objective because he was not "internalizing any of the information he was being given." Marvin would argue with the parenting coach about parenting techniques. His progress was stagnant because he wanted to focus on his frustration with DCFS, and he also lacked understanding of D.D.'s developmental needs. Before he began the parenting classes, Marvin took a "pre-test" and was rated as a "medium risk" in all five categories. After he completed the program, Marvin retook the test and was rated as a "medium risk" in three of the categories, and as a "high risk" in the remaining two categories. Stated another way, Marvin's parenting knowledge had diminished. Horcharik testified that over time, Marvin's attendance at supervised visits with D.D. decreased, and Marvin declined all opportunities to make up time missed.

¶ 34    Horcharik also testified that Marvin had been in the same apartment throughout most of this case. Through no fault of his own, the city shut off water services to the apartment complex, and he was evicted because the apartment complex had been sold. He obtained new housing through Homeward Bound in March 2023.

¶ 35    Marvin testified at the fitness hearing that since D.D. was born in February 2014, he spent most weekends with Marvin. Marvin testified that he only left D.D. with Ashlina on that one occasion, which he said was an emergency. He testified that he had no family in the Decatur area but indicated that he might have been able to leave D.D. with a deacon from his church. Marvin testified that he attended all mental health appointments unless he had a conflict with a medical appointment. However, he testified that he never understood why he was required to have

12

counseling sessions as he does not have mental health issues. Marvin testified that when he attended the sessions, he would talk about his lack of understanding about what was happening in his case and how he was unhappy with the current situation. Parenting classes were initially held at his apartment but transitioned to a business location when the condition of the apartment complex deteriorated. Marvin testified about the difference between being D.D.'s father on a daily basis versus being D.D.'s father during supervised visits. The interaction he had with D.D. was completely different in the visitation setting. He could no longer cook for D.D., take him to the library, or go outside and play catch with him. Instead, they were in the supervised setting, and there would be a limit to how much they could share and do within those parameters. Marvin admitted to ending some of the sessions early.

¶ 36 The trial court stated that while it found that Marvin's testimony largely credible, his testimony that he had only left D.D. in Ashlina's care on that one date was less than truthful. The court ruled on the record that the State had established by clear and convincing evidence that Marvin was an unfit parent. Specifically, the court found that the State had established that Marvin failed to maintain a reasonable degree of responsibility as to D.D.'s welfare (750 ILCS 50/1(D)(b) (West 2020)); failed to make reasonable efforts to correct the conditions that were the basis for D.D.'s removal during any nine-month period following the adjudication of neglect (*id.* § 1(D)(m)(i)); and failed to make reasonable progress toward D.D.'s return during the nine-month periods from September 9, 2021, to June 9, 2022, and June 9, 2022, to March 2023 (*id.* § 1(D)(m)(ii)).

¶ 37 On June 28, 2023, DCFS filed its best interest report requesting that the court terminate Marvin's parental rights. D.D. and his older brother, S.C., were both placed in a relative foster home with a maternal uncle on February 24, 2021. D.D. was excelling at school, thriving in the

structured environment, and "has been allowed to have fun and enjoy life as a child." The current foster parent allowed Ashlina to interact with both children under his supervision. DCFS stated that D.D. had developed a loving and trusting bond with his caregiver from whom D.D. sought physical and emotional support. DCFS stated that this caregiver had done an excellent job of advocating for D.D. with DCFS. The maternal uncle had expressed to all parties his desire and willingness to adopt both D.D. and S.C. DCFS concluded that D.D. "has finally achieved a sense of safety and stability within his current placement."

¶ 38    On July 6, 2023, the trial court held the best interest hearing. Again, the State called Lindsay Horcharik to testify, and Marvin testified on his own behalf.

¶ 39    Horcharik testified that she had been assigned to D.D.'s case since its inception when he was removed from Ashlina's home. D.D. had been in his current relative foster placement since February 2021. She stated that D.D.'s learning and speech issues had greatly improved and that his foster family communicates with school personnel and works with D.D. on his homework and learning needs. Horcharik testified that D.D. was bonded with his foster parents, and that they were committed to permanence for D.D. and his brother, S.C. Horcharik concluded that she believed that it was in D.D.'s best interest to terminate Marvin's parental rights so that he could achieve permanency in his current home. On cross-examination, Horcharik testified that she believed that the foster parents were willing to allow Marvin to have contact with D.D. if Marvin chose to do so.

¶ 40    Marvin testified that despite his medical disability, he was able to maintain a household for D.D. Marvin stated that he did not believe that termination of his parental rights was appropriate and stated that if D.D. was returned to his care, he would not allow him to have unsupervised visits with Ashlina.

14

¶ 41    At the conclusion of the best interest hearing, the court noted that both witnesses were credible. The court found that the most important best interest factor was D.D.'s physical safety and welfare. The court noted that D.D. had been in his current relative foster placement since February 2021, and he had developed a sense of identity in the placement, a sense of attachment with the family, and he was now bonded with his foster family. The court stated that the foster parents were supportive and advocated for him, and that this support had helped D.D. excel and perform well at school without behavioral issues. The court found that D.D.'s sense of attachment, sense of security, sense of familiarity, and continuity of affection all favored termination. Additionally, the court found that this current placement was the least disruptive for D.D., and that D.D. had some community ties that would not be disrupted if Marvin's parental rights were terminated. Overall, given the length of the case, and D.D.'s need for permanence, the court concluded that the State proved by a preponderance of the evidence that D.D.'s best interest would be served by terminating Marvin's parental rights.

¶ 42                                    II. ANALYSIS

¶ 43    Marvin appeals from the trial court's orders finding that he was an unfit parent and terminating his parental rights.

¶ 44    The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)) provide the legal authority for the involuntary termination of parental rights in Illinois. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re J.L.*, 236 Ill. 2d 329, 337 (2010)). Section 2-29 of the Juvenile Court Act of 1987 provides the procedural basis for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). The process mandated involves two hearings. In the first hearing, the State must prove by clear and convincing evidence that the parent is an "unfit person" as defined by the Adoption

15

Act. *Id.* (citing *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994)); 750 ILCS 50/1(D) (West 2020). If the trial court finds that the parent is unfit, the case proceeds to a second hearing where the State must prove, by a preponderance of the evidence, that it is in the child's best interest that the parent's rights be terminated. *Id.* (citing *In re J.L.*, 236 Ill. 2d at 337-38); 705 ILCS 405/2-29(2) (West 2020).

¶ 45    When a parent appeals the trial court's findings that a parent is unfit and that terminating the parental rights is in the child's best interest, the appellate court must not retry the case but, instead, must review the trial court's findings to determine if the findings are against the manifest weight of the evidence. *Id.* ¶ 31 (citing *In re A.W.*, 231 Ill. 2d 92, 104 (2008)). The reviewing court gives great deference to the trial court's finding of unfitness because the court had the best opportunity to view and evaluate the parties and their testimony. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006)). Therefore, we do not reweigh the evidence or reassess the credibility of the witnesses on appeal. *Id.* (citing *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001)). "A decision is contrary to the manifest weight of the evidence if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *Id.* (citing *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28).

¶ 46                               A. Fitness

¶ 47    We first review the evidence to determine if the State met its burden of proving, by clear and convincing evidence, that Marvin was an "unfit person." The trial court determined that the State met its burden of proof on the following bases: (1) that Marvin failed to maintain a reasonable degree of responsibility as to D.D.'s welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) that Marvin failed to make reasonable efforts to correct the conditions that were the basis for D.D.'s removal during any nine-month period after the adjudication of neglect (*id.* § 1(D)(m)(i)); and (3) that

16

Marvin failed to make reasonable progress toward D.D.'s return within two specific nine-month periods following the adjudication of neglect—(a) September 9, 2021, to June 9, 2022, and (b) June 9, 2022, to March 9, 2023 (*id.* § 1(D)(b)(ii)).

¶ 48    Marvin argues that the trial court erred in finding that he was an unfit parent because he had completed parenting classes, was engaged in mental health services, and attended his supervised visits with D.D.

¶ 49                    1. *Reasonable Degree of Interest, Concern, or Responsibility*

¶ 50    The language used by our legislature in section 1(D)(b) of the Adoption Act is in the disjunctive, meaning that any one of the three separate segments—interest or concern or responsibility—"may be considered by itself as a basis for unfitness." *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31 (citing 750 ILCS 50/1(D)(b) (West 2012); *In re Richard H.*, 376 Ill. App. 3d 162, 166 (2007)). To determine if a parent has shown a reasonable degree of interest, concern, or responsibility for a minor's welfare, the court "considers the parent's efforts to visit and maintain contact with the child as well as other indicia, such as inquiries into the child's welfare." *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064). The court can also consider evidence that the parent completed his or her service plan as establishing the parent's interest, concern, or responsibility. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1065). A parent's effort is more important than a parent's success with the service plan objectives. *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990)). "In this regard, the court examines the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred." *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d at 278). Circumstances of the parent's difficulties in completion of plan objectives and/or in attending visitation, including transportation issues and poverty, are relevant in assessing the reasonable degree of a parent's interest, concern, or responsibility for the minor's welfare. *Id.*

(citing *In re Adoption of Syck*, 138 Ill. 2d at 278-79). "We are mindful, however, that a parent is not fit merely because he or she has demonstrated some interest or affection toward the child." *Id*. (citing *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004)). Instead, the court must objectively assess whether the interest, concern, or responsibility is reasonable. *Id*. (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064).

¶ 51 Here, the trial court concluded that Marvin showed interest and concern but failed to establish responsibility toward D.D.'s return. This case had a delayed presentation in that DCFS initially chose to place D.D. with Marvin, his biological father, when D.D. was removed from Ashlina's care. Moreover, Marvin had been D.D.'s caregiver during a previous DCFS case, and since 2019 when Ashlina became homeless. After Marvin chose to leave D.D. in Ashlina's unsupervised care in February 2021, DCFS removed D.D. from Marvin's care, which resulted in DCFS requiring Marvin to complete his own service plan objectives. Although DCFS only required Marvin to engage and advance in mental health counseling and parenting classes, he did not successfully complete these objectives during the time frame of this case—from late February 2021 until March 29, 2023.

¶ 52 Although Marvin attended his mental health counseling sessions, he never improved or obtained understanding about his codependent relationship with Ashlina. That codependency led Marvin to disregard the DCFS mandates about Ashlina's unsupervised access to the children, which was the core issue in the opening of his case.

¶ 53 Similarly, Marvin completed the parenting classes, but regressed in his knowledge as evidenced by the tests of parenting knowledge taken before and after the classes. Moreover, there was testimony that Marvin was unable to internalize and/or utilize the parenting information and

18

tools taught in the classes. In addition, Marvin seemed to lack understanding of D.D.'s developmental age as DCFS noted during his supervised visits.

¶ 54    Marvin participated in his supervised visits with D.D. There was no question that he loved D.D. and brought appropriate meals and snacks to share with him. However, Marvin struggled with engagement with D.D. given the confines of the supervised visits which were held in an indoor setting. Marvin admitted that he sometimes ended the visits before his time had concluded as he simply did not know what else to do during the allotted time with D.D. Moreover, although he was offered the opportunity to make up the time during other visits, Marvin declined those opportunities. Marvin never advanced to unsupervised or overnight visits with D.D.

¶ 55    We must give great deference to the trial court's finding of unfitness as the court was able to evaluate the demeanor and testimony of Marvin and DCFS placement supervisor, Lindsay Horcharik. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064). Overall, we agree with the trial court's findings that Marvin maintained a reasonable degree of interest and concern for D.D., but he failed to maintain a reasonable degree of responsibility for D.D. as evidenced by his failure to fully engage in mental health counseling and visitation, and his failure to learn and utilize the parenting skills he was taught in the parenting classes. We find that the trial court's finding is not contrary to the manifest weight of the evidence. *In re M.I.*, 2016 IL 120232, ¶ 21; *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re A.W.*, 231 Ill. 2d at 104).

¶ 56                    2. *Reasonable Effort Within Any Nine-Month Period*

¶ 57    "Reasonable effort" is determined by a subjective standard that refers to the amount of effort which is reasonable for that parent. *In re Daphnie E.*, 368 Ill. App. 3d at 1066-67. The court must determine whether the parent has made committed and diligent efforts toward correcting the

19

conditions that led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24. "A parent's deficiencies collateral to the conditions that were the basis for the removal of the children are not relevant to the reasonable efforts analysis." *In re D.F.*, 332 Ill. App. 3d 112, 125 (2002).

¶ 58 Marvin argues that the trial court's finding that he was unfit for failure to make reasonable efforts to correct the conditions that brought D.D. into DCFS custody was contrary to the manifest weight of the evidence. D.D. was removed from Marvin's care because he left D.D. in the unsupervised care of Ashlina. As a result of Marvin's actions, DCFS determined that he needed to address the codependent relationship he had with Ashlina and to engage in parenting classes. Both service plan objectives were designed to ensure that Marvin understood why he left D.D. in a potentially unsafe setting with Ashlina and to ensure that he did not place D.D. in an unsafe setting in the future. Unfortunately, Marvin did not successfully complete either mandated service, and thus did not make "a committed and diligent effort" to correct the underlying conditions. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24. We find that the trial court's order finding that Marvin failed to show a reasonable effort toward correcting these conditions is not contrary to the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28).

¶ 59 3. *Reasonable Progress Within a Nine-Month Period*

¶ 60 The term "reasonable progress" requires an objective determination regarding the amount of progress based upon the conditions existing at the time the minor child's custody was removed from the parent. *Id.* ¶ 47 (citing *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

> " 'The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service

20

plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent.' " *Id*. (quoting *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

"A parent makes reasonable progress when the trial court can find that the progress 'is sufficiently demonstrable and of such a quality' that the trial court may soon be able to order the return of the minor to the parent's custody." *Id.* (quoting *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

¶ 61 Here, the trial court found that Marvin failed to make reasonable effort during any nine-month period following the court's adjudication of neglect. More specifically, the court separately concluded that Marvin failed to make reasonable progress during two specific nine-month periods—September 9, 2021, to June 9, 2022, and June 9, 2022, to March 9, 2023.

¶ 62 During the approximate two years that Marvin's DCFS case was open, he was unsuccessful in both his mental health and parenting service plan objectives. We agree with the trial court's finding that Marvin failed to make reasonable progress to correct the conditions that were the basis for the removal of D.D. during the two specific nine-month periods—September 9, 2021, to June 9, 2022, and June 9, 2022, to March 9, 2023.

¶ 63                              4. *Finding That Marvin Was Unfit*

¶ 64 Having determined that Marvin failed to show a reasonable degree of responsibility, failed to show a reasonable effort on his service plan objectives during any nine-month period, and failed to show reasonable progress on his service plan objectives during two specific nine-month periods, we conclude that the trial court's order finding that Marvin was an unfit parent is not contrary to the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re A.J.*, 269 Ill. App. 3d at 828).

21

¶ 65                                    B. Best Interest

¶ 66     Termination of a parent's rights is a difficult and final step. *In re Adoption of Syck*, 138 Ill. 2d at 274-75. Parents maintain the important right to raise their own children. *Id.* However, when a parent has been declared "unfit," "the parent's rights must yield to the child's best interest." *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002); *In re J.L.*, 236 Ill. 2d at 337-38. The interests of the parent and the child remain concurrent "to the extent that they both 'share a vital interest in preventing erroneous termination of their natural relationship' " until the court declares that the parent is unfit. *In re D.T.*, 212 Ill. 2d 347, 363 (2004) (quoting *Santosky v. Kramer*, 455 U.S. 745, 760-61 (1982)).

¶ 67     At the best interest hearing, the State must establish proof that termination of a parent's rights is in the child's best interest by a preponderance of the evidence. 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*, 212 Ill. 2d at 366. We review the trial court's best-interest decision with the manifest weight of the evidence standard. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009); *In re S.J.*, 368 Ill. App. 3d 749, 755 (2006). A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result. *In re Daphnie E.*, 368 Ill. App. 3d at 1072. On appeal from an order terminating a parent's rights, the reviewing court gives great deference to the trial court's decision because the trial court was in a much better position to see the witnesses and judge their credibility. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000).

¶ 68     "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. The trial court must analyze several factors within "the context of the child's age and

22

developmental needs" when considering if termination of parental rights serves a child's best interest. 705 ILCS 405/1-3(4.05) (West 2020). Those factors include:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." *Id.*

The trial court is not required to make an explicit finding on each of the best interest factors. *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 33 (citing *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19);

23

*In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43 (citing *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 424 (1991)). Another factor the trial court may consider is the likelihood of adoption. *In re Tashika F*., 333 Ill. App. 3d at 170.

¶ 69     During the best interest hearing, Marvin testified that despite his health issues, he had been able to provide D.D. with a stable home. He stated that he did not believe that the court should terminate his parental rights, and that if provided the opportunity, he would not allow Ashlina to have unsupervised visits with D.D. We do not have reason to doubt this testimony. However, the trial court found that D.D.'s current relative foster home provided a more permanent and appropriate placement, and that the foster parents were willing to adopt him. *Id.*

¶ 70     The trial court was most concerned with D.D.'s safety and welfare. The court noted the duration of his relative foster home placement and the fact that D.D. was bonded with his family. D.D.'s brother, S.C., was also in this home, and would be adopted. The court stated that D.D. was being supported by his family and was thriving in school. D.D.'s sense of familiarity, attachment, security, and continuity of affection favored termination. The court commented that this relative placement was the least disruptive for D.D., who had familial and community ties that could be sustained. The court also noted that D.D. deserved permanence given the duration of this case.

¶ 71     Here, the record clearly establishes that termination of Marvin's parental rights was the appropriate outcome for D.D. under all the circumstances. We conclude that the trial court's decision to terminate Marvin's parental rights was not contrary to the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002).

24

¶ 72                          III. CONCLUSION

¶ 73    For the foregoing reasons, we affirm the judgments of the circuit court of Macon County finding that Marvin was an unfit parent, and that the best interest of D.D. required the termination of his parental rights.


¶ 74    Affirmed.